858 So.2d 483 (2003)
Shelby R. DAY
v.
Rosie Nell Laborde DAY.
No. 2002 CA 0431.
Court of Appeal of Louisiana, First Circuit.
May 28, 2003.
Writ Denied November 7, 2003.
*484 Kreig A. Breaux, New Iberia, for Defendant-in-Rule/Appellee Shelby R. Day.
Tommy K. Cryer, Shreveport, for Plaintiff-in-Rule/Appellant Rosie Nell Laborde Day.
Before: PARRO, McDONALD, and CLAIBORNE,[1] JJ.
PARRO, J.
Rosie Nell Laborde Day appeals a judgment that dismissed her claims against her former husband, Shelby R. Day, for certain support payments and for community property interests in his military and civilian retirement plans. We amend and affirm as amended.

*485 FACTUAL AND PROCEDURAL BACKGROUND
Rosie Nell Laborde Day and Shelby R. Day were married October 17, 1964, and divorced October 10, 1991. In the divorce judgment, Mrs. Day was awarded permanent alimony in the amount of $400 per month, payable $200 on the 1st and $200 on the 15th of each month. On March 18, 1992, the parties executed a community property settlement agreement (the agreement), which stated, in pertinent part:
Shelby R. Day, as a further consideration of the transfers herein made, agrees to pay to Rosie Nell Laborde Day the sum of $400.00 per month as alimony and support, which support shall be paid on the first day of each month hereafter and shall continue until Rosie Nell Laborde Day reaches her 62nd birthday, at which time the parties agree that all alimony and support shall cease and terminate. The parties agree not to modify said amount by increase or decrease, however, said amount shall terminate upon the remarriage of Rosie Nell Laborde Day.
Shelby R. Day and Rosie Nell Laborde Day agreed that each shall be entitled to and received (sic) 50% each of all 401K savings and stock invested with or issued in either of the (sic) names with Honeywell, Inc. as of October 16, 1991, Shelby R. Day agrees to pay all penalties for early withdrawal of any sums of money withdrawn therefrom. Rosie Nell Laborde Day agrees to pay all taxes due on any sums of money received by her therefrom.

* * *
The parties hereto declare that the property described in the foregoing transfers constitutes all of the property belonging to the community formerly existing between them and that they do hereby relieve and release each other from any further accounting for the property herein described.
The agreement does not discuss Mr. Day's military retirement benefits.
Mrs. Day's petition to enforce the agreement and to make support arrearages executory was filed February 16, 2000; it stated Mr. Day had not paid alimony awarded by the court in the divorce judgment and had not paid $400 per month as specified in the agreement. Mrs. Day also claimed he had refused to release and/or deliver to her 50% of the 401(k) savings and stock invested with Honeywell, Inc., and asked that he be required to pay her the value in those accounts as of October 16, 1991, together with any later-deposited dividends and interest. Finally, she claimed the partition agreement was silent as to her community interest in Mr. Day's military retirement benefits[2] and as to any retirement benefits from his employment with Honeywell, and asked the court to recognize her ownership interest in those retirement plans.
In April 2000, a hearing was held on past-due court-ordered alimony, after which the court ordered Mr. Day to pay $24,600 plus legal interest from the date each payment was due until paid, continuing payments as they accrued, attorney fees, and court costs.[3] Mr. Day was also *486 found in contempt of court and sentenced to 90 days in jail; execution of the sentence was deferred 120 days, during which time he could pay all that was due and have his sentence set aside. Mr. Day stated in a deposition that he had paid all the arrearages and interest required by this judgment and had kept the payments current.
After a trial, the court ruled that the $400 "as alimony and support" in the agreement was "merely an adoption of the alimony order in the judgment of divorce" and dismissed Mrs. Day's claim for an additional $400 per month contractual support. The court also found that the language in the agreement regarding the 401 (k) account did not require Mr. Day to withdraw 50% of the funds and give them to Mrs. Day. Rather, the court interpreted the agreement as recognizing Mrs. Day's 50% ownership interest in whatever was in the account, which she could claim at any time by executing a Qualified Domestic Relations Order (QDRO) and submitting it to Honeywell. Finally, the court ruled Mrs. Day had waived her rights to Mr. Day's military retirement benefits. The judgment was signed July 13, 2001. Mrs. Day's motion for new trial was denied on October 25, 2001, and she appealed.[4]

ISSUES ON APPEAL
Mrs. Day contends that the agreement is not ambiguous, and therefore, parol evidence should not have been admitted by the trial court. However, should this court conclude that the agreement is not clear, she argues that any ambiguities should be interpreted against Mr. Day, because it was prepared at his direction by his attorney.
With this in mind, she asserts that the agreement clearly provides for support payments to her of $400 per month and does not say those payments are in lieu of or instead of the court-ordered alimony; any perceived ambiguity in the provision should be interpreted against Mr. Day, whose attorney drafted the agreement. She further argues that even if this court agrees with the trial court that the monthly support in the agreement was a reiteration or adoption of the court-awarded alimony, its inclusion in the agreement makes it contractual, such that it can be enforced for up to ten years, rather than the five-year enforcement limitation applicable to alimony arrearages.
With reference to the 401(k) plan, Mrs. Day argues that the judgment of the trial court writes out of the agreement the parties' clear statement that Mr. Day agreed to pay any early withdrawal penalties, because if she withdraws funds from her own portion after executing a QDRO, she will have to pay those penalties. She claims this language shows the parties intended for Mr. Day to withdraw those funds and pay them to her at that time and with the valuation as of October 16, 1991. She says this intent is also reflected in the use of *487 the word "received" in the agreement, suggesting actual payment was intended.[5]
Finally, Mrs. Day maintains that when a community property partition is silent as to the division of pension benefits, that silence is not a waiver of the spouse's ownership rights, and the benefits can be partitioned in a later act or by the court. She claims that the release language, which is restricted to "property herein described," provides further support for her position, since the military retirement benefits are not described anywhere in the agreement.[6]

PAROL EVIDENCE
When the court is asked to interpret an authentic act, the admission of parol evidence is governed by Louisiana Civil Code article 1848, which states:
Testimonial or other evidence may not be admitted to negate or vary the contents of an authentic act or an act under private signature. Nevertheless, in the interest of justice, that evidence may be admitted to prove such circumstances as a vice of consent, or a simulation, or to prove that the written act was modified by a subsequent and valid oral agreement.
Although parol evidence is generally not admissible to vary or contradict the terms of an authentic act, in the interest of justice, it may be admitted under certain circumstances. Sonnier v. Boudreaux, 95-2127 (La.App. 1st Cir.5/10/96), 673 So.2d 713, 718. Between two parties to an instrument, parol evidence is admissible to show fraud, mistake, illegality, want or failure of consideration, or to explain an ambiguity when such explanation is not inconsistent with the written terms. Scafidi v. Johnson, 420 So.2d 1113, 1115 (La. 1982). In First State Bank & Trust Co. v. Seven Gables, Inc., 501 So.2d 280, 285-86 (La.App. 1st Cir.1986), writ denied, 502 So.2d 103 (La.1987), this court allowed parol evidence in a dispute over a guaranty agreementan authentic actwhen a date reference was clearly incorrect. Also, this court recently affirmed the admission of parol evidence to explain the commencement date for alimony payments; the authentic act providing for those payments was ambiguous, because the day and date used in the document did not exist. Holliday v. Holliday, 00-0533 (La.App. 1st Cir.8/17/01), 795 So.2d 423, 428, amended on rehearing on other grounds, 00-0533 (La.App. 1st Cir.9/28/02), 797 So.2d 774. In McCarroll v. McCarroll, 96-2700 (La.10/21/97), 701 So.2d 1280, 1286, parol evidence was allowed to clarify an ambiguity in an authentic act, namely, whether retirement benefits were contemplated by the parties when they used the term, "movable property" in that act.
Unlike those cases, neither party in this case seeks to negate or vary the contents of the agreement, which is an authentic act. Nor do they contend that the agreement itself is ambiguous or that there was some mutual mistake in its drafting or confection. Rather, the issue involves the relationship between two documentsthe judgment of the trial court awarding Mrs. Day $400 per month alimony and the later agreement confected by *488 the parties in which they agreed to the same amount of alimony. This relationship cannot be determined from the two documents themselves, as neither references the other. Mrs. Day argues that because the later-signed agreement did not say that the $400 per month alimony was "in lieu of" or "the same as" that awarded in the judgment, it must be an additional amount. Conversely, Mr. Day contends that because the agreement did not say that the $400 per month alimony was "in addition to" that awarded in the judgment, it must be a reiteration of that award. Because the parties are not trying to vary the terms of the agreement, but are attempting to explain the relationship between the agreement and the earlier judgment, a factual question that cannot be discerned by examining the two documents, we conclude that the trial court did not err in allowing parol evidence to clarify this issue.
With reference to Mr. Day's military retirement benefits, parol evidence was also admissible, because these benefits were not mentioned at all in the agreement. Therefore, Mrs. Day's claims concerning entitlement to those benefits could only be determined through extrinsic evidence.

ALIMONY/SUPPORT
Mr. Day testified that the parties agreed that he would pay Mrs. Day $400 per month for alimony, and that this amount was included in the judgment of divorce. However, Mrs. Day was concerned with the wording in the judgment of divorce, which awarded her alimony "until further orders of this Court." She feared he might try to have the alimony reduced or eliminated at some future time. Therefore, she wanted the property settlement agreement to include a provision stating that the alimony would not terminate until she reached 62 years of age. Mr. Day said he told her:
Fine, then we can modify what was in the divorce decree [and include it] in this document right here that I would have to pay you $400.00 alimony until your 62nd birthday.
He said it was this request from Mrs. Day that generated the alimony provision in the agreement, and that neither of them ever discussed or intended that he would pay two alimony payments per month of $400 each.
On cross-examination, Mrs. Day confirmed Mr. Day's testimony in the following colloquy:
Q. Okay, and you do recognize that joint exhibit number one(1), the community property settlement agreement also has the identical amount, $400.00, also classified as "alimony"?
A. Yes I realize that is how it is written, yes.
Q. And you would also admit that you did have a conversation with Mr. Day shortly after the judgment was entered, whereby the judgment, joint exhibit two(2) states that, that amount is payable until further order of the court, correct?
A. Right.
Q. And that concerned you, because you didn't want it terminated right?
A. I wanted it until I was 62.
* * *
Q. So the concerns you had in the language of the judgment that alimony can be changed, "by order of the Court," was satisfied by that paragraph. It was going to be good until you were 62, and [he] could not challenge it or change it?
A. Right.
However, Mrs. Day also stated she always believed the alimony provided in the *489 agreement was a separate and additional payment, beyond what had been ordered in connection with the divorce. On re-direct examination, Mrs. Day responded affirmatively to the following questions:
Q. At ... execution of this agreement was it your expectation that you would want to continue to receive the alimony ordered by the court in the October judgment?
A. Yes.
Q. And that you were going to receive an addition[al] amount of $400.00 cash to offset the value of the equity of the home ...
A. That is rightThat is correct[,] Sir.
Mrs. Day acknowledged that she had not ever been paid $800 per month and had not tried to collect any additional alimony in the many years preceding this litigation.
In addition to the parties' testimony, Mr. Day presented the testimony of their son, George Keith Day, who said that, based on discussions with his mother concerning the amount of alimony, he understood "she was supposed to get like $400.00 a month or something like that." He encouraged her to "ask for more alimony," but she declined, indicating she "was happy with just getting a little bit [of] alimony...." He did not recall any discussions in which his mother indicated she would receive two separate alimony payments for a total of $800. He also said that after the divorce, during a time when his mother lived with him and his first wife, his mother received $400 per month "and that is what she said she wanted."
The agreement was drafted by Mr. Day's attorney, Robert L. Freeman, based on information provided to him by his client and hand-written notes from Mrs. Day. His recollection concerning the relationship between the alimony payments ordered in the judgment and those provided by the agreement was that "they were actually the same[;] one was just reinstated in the other." He said, "It was not going to be a one $400.00 payment here and one $400.00 here, ..." but rather "one $400.00" payment.
In addition to this testimonial evidence, Mr. Day submitted two documents from Mrs. Day that summarized some of their negotiations concerning the alimony and property settlement. The first of these documents, which was typed by Mrs. Day and bears the heading, "Divorce Terms and Agreements," refers to March 17, 1991, as a date the parties discussed certain things. Mr. Freeman testified that he reviewed this document with Mr. Day and made marginal notes in red ink to indicate his client's responses and counter-proposals. In item 4, Mrs. Day proposed, "Total support of $800.00 per month for a period of one year while I go to school and learn a trade in order to support myself." The notation in red ink indicates Mr. Day would only agree to $600 per month for the first year. In item 6, Mrs. Day proposed, "One-third of your military retirement pay of $350.00 per month until I reach the age of 62 or at a time when you no longer receive that pay." Mr. Day's counter-proposal indicates that after one year at $600 per month, he would agree to pay $400 per month from his military retirement pay until she reached age 62 or remarried. In item 7, Mrs. Day proposed, "You pay alimony of $300.00 per month for at least 5 years." Alongside that proposal, Mr. Day's response is a terse "No."
On November 21, 1991, Mrs. Day mailed a letter to Mr. Freeman, enclosing a written copy of terms to which she said she and Mr. Day had agreed concerning their community property settlement. In that document, she had written the following:
Mr. Day agrees to pay Mrs. Day support of $400.00 per month for the next *490 11 years. This support is to be paid on the 1st day of each month and no later. Mr. Day agrees that this support of $400.00 each month cannot be contested or altered at anytime, unless Mrs. Day remarries. This agreement between Mr. and Mrs. Day on October 4, 1991[,] and again on November 12, 1991, was a firm agreement.
Mr. Day's attorney testified that he noted in the margin alongside this item, "OK," based on discussions with his client. Mr. Freeman also circled the words "next 11 years," and wrote in the margin, "62nd birthday."
In Bonck v. Bonck, 500 So.2d 798, 800 (La.App. 1st Cir.1986), writ denied, 501 So.2d 774 (La.1987), this court cited with approval the rationale of the Third Circuit in King v. King, 390 So.2d 250 (La.App. 3rd Cir.1980), writ denied, 396 So.2d 884 (La.1981), on which the trial court relied in this case. In the King case, the parties contractually agreed to alimony payments of $200 per month until Mrs. King remarried; the same amount of alimony was included in the judgment, which could be revised or terminated upon further orders of the court. Mr. King eventually demonstrated a change in circumstances sufficient for the trial court to terminate the alimony, and Mrs. King appealed, seeking to collect $200 per month pursuant to the judgment and another $200 per month as specified in the parties' agreement. The court concluded that the contract provision was merely an adoption of the court order, stating:
[W]e find that the parties did not intend for Mrs. King to receive $400.00 per month as alimony. The parties intended to signify their approval of the alimony judgment by including it in the community property settlement. However, they intended to affect their respective alimony rights and obligations by providing for the payment of alimony until Mrs. King's remarriage rather than until further orders of the court.
King, 390 So.2d at 254. The court further held that Mr. King had waived his right to have the $200 per month alimony payments changed or terminated.
Based on our review of the testimonial and documentary evidence in the case before us, we agree with the trial court that the evidence simply does not support Mrs. Day's contention that she was to receive a total of $800 for alimony each month. Perhaps the most telling piece of evidence is her own proposal in March 1991seven months before the divorce judgmentin which the amount of $800 was mentioned only in the context of the first year's payments. In her proposals concerning military retirement benefits and alimony, the total requested from both sources was $650 per month. It strains logic to believe that Mr. Day would have negotiated himself into paying $800 in alimony per month, when she had only asked for $650 per month from both alimony and military retirement benefits. We agree with the conclusion of the trial court that the alimony payments specified in the agreement were a reiteration of those ordered by the court in the divorce judgment, with the additional proviso that the payments would not be altered or discontinued until Mrs. Day reached age 62 or remarried.
Moreover, we disagree with Mrs. Day's claim that inclusion of the alimony provision in the agreement converted it into an obligation enforceable for up to ten years, rather than the five years already ordered by the trial court. Even though the payments were re-stated in the contractual agreement, they are still clearly described in that document as "alimony and support." This court noted in Bonck that divorced spouses may validly contract with each other for permanent alimony, *491 without changing the character of the payments. The court stated:
The reasons for such an agreement are set forth in Jones v. Jones, 459 So.2d 1200, 1204 (La.App. 5th Cir.1984), writ denied, 462 So.2d 649 (La.1985) as follows:
The record supports our conclusion that the agreement states a bargained-for arrangement advantageous to both parties. Mrs. Jones is assured of a set sum of monthly payments, regardless of any change in circumstances which ordinarily reduce or terminate those payments (other than remarriage). Should her income increase or needs decrease, she will not suffer a decrease in payment. On the other hand, Mr. Jones is assured that he will never have to face an increase, in the event of an unfortunate happenstance occurring to Mrs. Jones, such as illness or unemployment. In short, each party received benefits from the arrangement. Such does not change the character of the payments as alimony.
Bonck, 500 So.2d at 800. Even though the alimony payments were described in a contractual agreement, their nature as spousal support did not change. An action to make executory arrearages of spousal support is subject to a liberative prescription of five years. LSA-C.C. art. 3497.1. We conclude, therefore, that whether included in a contract or ordered by the court, the right to enforce those payments was limited to five years from the date each payment was due. As this obligation has already been satisfied by Mr. Day's payments pursuant to the trial court's May 8, 2000 judgment, Mrs. Day is not entitled to any further relief.

MILITARY RETIREMENT BENEFITS
Each spouse owns a present undivided one-half interest in the community during its existence. LSA-C.C. art. 2336. To the extent that a property right derives from the spouse's employment during the existence of the marriage, it is a community asset subject to division upon dissolution of the marriage. See LSA-C.C. art. 2338; Sims v. Sims, 358 So.2d 919 (La.1978); T.L. James & Co., Inc. v. Montgomery, 332 So.2d 834 (La. 1975). Consequently, when the community is terminated, the employee's spouse is entitled to be recognized as the owner of one-half of the value attributable to the pension or deferred compensation right earned during the existence of the community. See LSA-C.C. art. 2336; Robinson v. Robinson, 99-3097 (La.1/17/01), 778 So.2d 1105, 1114. When the community is terminated, each spouse becomes a fully vested co-owner in indivision of all property of the former community regime, including pension benefits acquired during the community. See LSA-C.C. 2369.2; see also Robinson, 778 So.2d at 1115.
Louisiana jurisprudence is clear; general divestiture language in a community property settlement agreement does not necessarily divest the non-employee spouse of his or her right in the employee spouse's pension. When the agreement does not expressly address the employee spouse's pension, the issue of whether the agreement divests the non-employee spouse of any community property rights in the pension depends on the intent of the parties. Jennings v. Turner, 01-0631 (La.11/28/01), 803 So.2d 963, 964. The issue of whether a pension was considered in property settlement discussions is a question of fact. Robinson, 778 So.2d at 1119; Jennings, 803 So.2d at 964.
The Robinson court reviewed the jurisprudence to determine the situations in which courts had allowed supplemental *492 partitions of pension benefits when those were not addressed in community property settlements. When later partitions were allowed, the courts generally had found that the spouses did not discuss the pension benefits before confecting their community property settlements, and therefore their intent to include those benefits in their agreements was not supported by the evidence.[7]See Hare v. Hodgins, 567 So.2d 670 (La.App. 5th Cir.1990), reversed in part on other grounds, 586 So.2d 118 (La.1991); Faucheaux v. Faucheaux, 97-1369 (La.App. 4th Cir.1/28/98), 706 So.2d 654, writ denied, 98-0482 (La.4/9/98), 717 So.2d 1146. On the other hand, in cases in which the courts found both spouses were aware of and had discussed the pension benefits prior to confecting their community property settlements, the conclusion reached was that they had intended for the agreement to settle all community property, including pension benefits that were not specifically addressed in the document. See Chrisman v. Chrisman, 487 So.2d 140 (La.App. 4th Cir.1986); Brignac v. Brignac, 96-1702 (La.App. 3rd Cir.6/18/97), 698 So.2d 953, writ denied, 97-2584 (La.1/16/98), 706 So.2d 976. In both the Robinson and Jennings cases, the supreme court found that the parties had not discussed the husband's pension plan at all during their negotiations leading up to the settlement of community property. In fact, the court in the Jennings case accepted the wife's testimony that she did not even know her husband had a pension plan until after she had signed the agreement.
Both parties in the case before us acknowledged that the military retirement benefits were discussed extensively, and the written proposal from Mrs. Day in March 1991 specifically references these benefits. However, Mrs. Day testified that she never agreed to give up her claim to those benefits. She said that when she signed the agreement, which did not mention them, she did so "[b]ecause Mr. Day had explained to me that the military retirement pay was a separate deal, that it had to be taken care of through the military and not included into this." To the contrary, Mr. Day and his attorney both testified that Mr. Day would not agree to pay Mrs. Day alimony plus a portion of his military retirement benefits; therefore, he agreed to pay more in alimony than she would have received from his military retirement benefits and to continue those alimony payments until she reached age 62 or remarried. The handwritten notations on Mrs. Day's March 1991 proposal support this testimony. In the November 1991 letter Mrs. Day sent to Mr. Day's attorney, she said the enclosed list summarized "what we came to an agreement on" regarding the community property settlement. The military retirement benefits were not mentioned in that enclosure. Additionally, their son said that when he asked his mother about his father's retirement, she responded that the retirement benefits were his and he had earned them. This conversation took place before the agreement was signed.
It is clear from the record that both parties were fully aware of Mr. Day's military retirement benefits and that these benefits were discussed extensively during the negotiation process. Relying on the jurisprudence and using this finding of fact as the critical factor in the case before us, we find no error in the trial court's conclusion that in confecting the agreement, Mrs.
*493 Day waived her rights to receive a portion of her husband's military retirement benefits.

THE HONEYWELL 401(k) PLAN
We have considered Mrs. Day's arguments and examined the wording of the agreement, and find no legal error in the trial court's judgment. The agreement recognized that each of the parties was entitled to 50% of the Honeywell 401(k) account, as of October 16, 1991.[8] The agreement further stated Mr. Day agreed to pay all penalties for early withdrawal of any sums, and Mrs. Day agreed to pay all taxes due on any sums that she might receive from the account. These provisions echo the instructions in Mrs. Day's November 1991 letter to Mr. Freeman.
The trial court's judgment ordered:
[T]hat the claims and demands of ROSIE NELL LABORDE DAY for one-half (1/2) of the subject Honeywell 401(k) as of the effective date of divorce, subject to market growth or diminution of her share to date, is recognized by the Court and parties, but no damages or legal interest are due ROSIE NELL LABORDE DAY thereon by SHELBY R. DAY and any claim or demand therefor be and is denied.
In reasons for judgment, the trial court noted that the language of the agreement did not order Mr. Day to withdraw funds and give them to Mrs. Day, and stated that she could obtain her portion of the funds from Honeywell simply by submitting and processing a QDRO. We agree. Her right to a 50% share of the asset was determined as of that date. Mrs. Day could have submitted a QDRO at that time or any time since then, obtained her share of the account, and invested it elsewhere if she chose. By 1 saving her share of the account on deposit with Honeywell, she submitted to the vagaries of the market and Honeywell's management and must accept whatever appreciation or depreciation in value that might have occurred since then.
However, because Mr. Day specifically agreed to pay any early withdrawal penalties, we believe the trial court judgment must be modified to include this requirement, should such penalties occur when and if Mrs. Day withdraws funds pursuant to a QDRO. Therefore, Mr. Day will be required to reimburse Mrs. Day for any early withdrawal penalties she might incur in taking possession of her share of the Honeywell 401(k) account.

CONCLUSION
The judgment of the trial court is amended to order Mr. Day to reimburse Mrs. Day for any early withdrawal penalties she might incur in taking possession of her share of the assets in the Honeywell 401 (k) account. In all other respects, the judgment is affirmed. Each party is to bear his/her own costs for this appeal.
AMENDED AND AFFIRMED AS AMENDED.
NOTES
[1] Judge Ian W. Claiborne, retired from the Eighteenth Judicial District Court, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] According to his testimony, Mr. Day's last day of active service in the military was June 30, 1979. Mr. and Mrs. Day were married for 14.667 years of the 21 years he spent in the military. Retirement benefits were already being paid to Mr. Day when the couple divorced.
[3] The judgment was signed May 8, 2000. The award for the arrearages represented only what had accrued during the five years preceding Mrs. Day's petition to enforce court-ordered alimony, because her entitlement to any spousal support obligations that might have accrued earlier prescribed after five years. See LSA-C.C. art. 3497.1.
[4] The motion and order for appeal refers only to the judgment of October 25, 2001. The denial of a motion for new trial is not an appealable judgment, absent a showing of irreparable injury. However, the Louisiana Supreme Court has directed us to consider an appeal of the denial of a motion for new trial as an appeal of the judgment on the merits, when it is clear from the appellant's brief that the intent was to appeal the merits of the case. Smith v. Hartford Acc. & Indem., Co., 254 La. 341, 223 So.2d 826, 828-29 (1969); Carpenter v. Hannan, 01-0467 (La.App. 1st Cir.3/28/02), 818 So.2d 226, 228-29, writ denied, 02-1707 (La. 10/25/02). Mrs. Day's brief addresses the substantive issues decided by the July 13, 2001 judgment on the merits. Therefore, we will treat this as an appeal of that judgment.
[5] Although Mrs. Day's assignments of error do not address the Honeywell 401(k) plan, she dedicated a section of her appellant brief to arguments concerning this issue and we have considered it on appeal. See LSA-C.C.P. art. 2129.
[6] There is no evidence in the record concerning any Honeywell retirement benefits other than the 401(k) plan, the judgment made no mention of any such benefits, and Mrs. Day has not addressed any such benefits in this appeal. We conclude, therefore, that her claim to such benefits has been abandoned.
[7] In one case, the parties and their attorneys, relying on a case that was later legislatively "overruled," believed that the military pension benefits were the husband's separate property, so did not include them in the community property settlement. Moreau v. Moreau, 457 So.2d 1285 (La.App. 3rd Cir.1984).
[8] This date was probably a typographical error; the divorce judgment was October 10, 1991, and Mrs. Day's letter of November 1991 indicates that "October 10, 1991, when the divorce became final," was the intended date. The trial court's judgment recognizes the effective date of the divorce as the operative date for the partition of the account, thereby correcting this discrepancy. The significance of this date is that Mrs. Day is not entitled to a share of any amounts contributed after that date by Mr. Day and/or his employer. Neither party has contested that aspect of the judgment on appeal.