HAROLD JOHN WAHLBORG
v.
ANNE SHERMAN WAHLBORG.
2007 CA 0157.
Court of Appeals of Louisiana, First Circuit.
December 21, 2007.
JACK M. DAMPF, THOMAS G. HESSBURG, Counsel for Appellee, Harold John Wahlborg.
BRIAN J. PRENDERGAST, and CHARLES F. WALTER, Counsel for Appellant Anne Sherman Wahlborg.
Before PARRO, KUHN, AND DOWNING, JJ.
KUHN, J.
Anne Sherman Wahlborg appeals a judgment that denied the relief requested in her "Petition to Partition Community Property," whereby she sought a supplemental partition of the retirement plan and retirement annuity ("retirement benefits") resulting from the employment of her former husband, Harold John Wahlborg. The court found Mr. Wahlborg had received all of the retirement benefits pursuant to the terms of a September 23, 1983 community property partition, implicitly finding merit in Mr. Wahlborg's peremptory exception that raised the objection of res judicata. In written reasons for judgment, the trial court set forth a detailed factual and procedural background and an analysis of the pertinent law. (See "Attachment A"). We affirm the trial court's judgment in accordance with Uniform Rules  Courts of Appeal, Rule 2-16.2A(2), (4), (5), (6), (7) and (8).
On appeal, Mrs. Wahlborg contends the trial court erred in sustaining Mr. Wahlborg's exception of res judicata. She asserts the trial court erred by: 1) failing to apply the pre-1991 standard for res judicata and in finding that Mr. Wahlborg had met his burden of proof; 2) determining the intent of the parties based on Mr. Wahlborg's testimony, and, in particular, that Mrs. Wahlborg intended to convey her rights in the retirement benefits when she executed the partition; 3) finding that the testimony of Elizabeth Wahlborg, the parties' daughter, was credible; 4) finding that Mr. Wahlborg exchanged most of the assets of the former community property for Mrs. Wahlborg's interest in the retirement benefits; 5) concluding that John Morton acted as a mandatory for Mrs. Wahlborg although no written mandate was offered into evidence;[1] 6) imputing to Mrs. Wahlborg the knowledge of her attorney, who had represented her before the partition was executed and who was aware that the retirement benefits existed before the partition was executed; 7) considering various items introduced as evidence during the trial of the exception; 8) admitting the testimony of a certified public accountant for the purpose of valuing the properties included in the partition; and 9) denying Mrs. Wahlborg an opportunity to amend prior to dismissing her petition.
Mrs. Wahlborg correctly urges that pre-1991 res judicata law is controlling. At the time the parties executed the community property partition, former La. C. C. art. 2286, the precursor of La. R.S. 13:4231, provided:
The authority of the thing adjudged takes place only with respect to what was the object of the judgment. The thing demanded must be the same; the demand must be founded on the same cause of action; the demand must be between the same parties, and formed by them against each other in the same quality.
Thus, under the prior law, relitigation of the object of a judgment was barred when there was present: (1) identity of the thing demanded; (2) the same cause of action; and (3) the same parties appearing in the same quality. Terrebonne v. Theriot, 94-1632, p. 4 (La. App. 1st Cir. 6/23/95), 657 So.2d 1358, 1361, writ denied, 95-2249 (La. 11/27/95), 663 So.2d 743. The burden of proof is upon the party pleading the exception to establish the essential facts to sustain the plea of res judicata. If any doubt exists as to its application, the exception of res judicata must be overruled, and the second suit maintained. Id.
Although the trial court did not reference La. C. C. art. 2286, the trial court's reasons for judgment indicate it made the appropriate factual determinations in ruling on the exception, i.e., whether Mr. and Mrs. Wahlborg had considered the retirement benefits and whether Mrs. Wahlborg had waived her interest in the retirement benefits when the 1983 partition agreement was executed, such that there was an identity of the cause of action and the thing demanded in both the prior compromise and in the current suit. See Robinson v. Robinson, 99-3097 (La. 1/17/01), 778 So.2d 1105; Brignac v. Brignac, 96-1702 (La. App. 3d Cir. 6/18/97), 698 So.2d 953, writ denied, 97-2584 (La. 1/16/98), 706 So.2d 976; Chrisman v. Chrisman, 487 So.2d 140 (La. App. 4th Cir. 1986).
The issue of whether a pension was considered in property settlement discussions is a question of fact, with the fact-finder afforded much discretion. Robinson v. Robinson, 99-3097 at p. 14, 778 So.2d at 1119. Our review of the record reveals the trial court made factual findings related to this issue, i.e., that the parties were both aware that the retirement benefits existed, the parties considered these assets before executing the 1983 partition, and Mrs. Wahlborg waived her interest in the retirement benefits when she executed the partition. These findings are reasonably supported by the record and are not manifestly erroneous. A reviewing court may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong, and where there is conflict in the testimony, inferences of fact should not be disturbed upon review, even though the reviewing court may feel that its own evaluations and inferences are as reasonable. Linnear v. CenterPoint Energy Entex/Reliant Energy, 06-3030, p. 7 (La. 9/5/07), ___ So.2d ___.
We likewise find no manifest error in the trial court determinations that it found Elizabeth Wahlborg to be credible and that Mrs. Wahlborg had exchanged her interest in the retirement benefits for most of the assets of the former community. The trial court as the trier of fact, who listens to the testimony of all of the witnesses, has vast discretion in determining the weight and credibility of each witness. See Bourg v. Bourg, 96-2422, p. 6 (La. App. 1st Cir. 11/7/97), 701 So.2d 1378, 1382. The trial record establishes a reasonable factual basis for these findings and does not show they are clearly wrong. Further, the evidence pertaining to valuation of the assets supported the trial court's conclusions that Mrs. Wahlborg intended to waive her interest in the retirement benefits and that she had received a greater portion of the community assets at the time of the partition to offset Mr. Wahlborg's later receipt of his retirement benefits.
Mrs. Wahlborg urges that the trial court erred in imputing Mr. Morton's actions to her. She asserts Mr. Wahlborg failed to introduce competent evidence that established she had authorized Mr. Morton to negotiate the community property settlement on her behalf. She contends that because Mr. Wahlborg failed to introduce a written mandate into evidence, the court erred in considering parol testimony regarding this issue. Mrs. Wahlborg also challenges the trial court's action of construing ambiguities in the partition agreement against her based on the court's finding that an attorney hired by Mr. Morton drafted it.
A mandate is a contract by which a person, the principal, confers authority on another person, the mandatary, to transact one or more affairs for the principal. La. C.C. art. 2989. The contract of mandate is not required to be in any particular form. La. C.C. art. 2993. But when the law prescribes a certain form for an act, a mandate authorizing the act must be in that form. Id. Although pursuant to La. C.C. art. 2996, "express authority" is required to alienate or acquire property, in this instance, Mrs. Wahlborg executed the partition on her own behalf.[2] Otherwise, we find no law that requires a written mandate for an agent to preliminarily negotiate the terms of an agreement on behalf of a principal.
Mr. Wahlborg testified that after Mr. Morton contacted him requesting that they finalize the property settlement, he did so. Mr. Wahlborg stated he received a power of attorney that authorized Mr. Morton to act on Mrs. Wahlborg's behalf. Mr. Wahlborg testified that during these negotiations, he told Mr. Morton he was willing to give up valuable property and equity therein to retain his retirement benefits.
Mrs. Wahlborg admitted that Mr. Morton had a general power of attorney to act on her behalf. She also admitted that he was her financial advisor and investor; she testified she handed over all of her financial documents to him, and he handled all of her money. Although Mrs. Wahlborg denied that she had charged Mr. Morton with negotiating the community property settlement, when the trial court questioned her as to whether Mr. Morton handled her affairs pursuant to a power of attorney, she responded, "It looks that way, yes." She also acknowledged that when Mr. Morton communicated to her that his attorney had prepared the partition agreement, she went to that attorney's office to sign the partition. Based on these facts, we find the trial court did not err either in determining that Mr. Morton acted pursuant to Mrs. Wahlborg's mandate or in attributing Mr. Morton's knowledge of the retirement benefits to Mrs. Wahlborg. Further, because the record reveals that Mr. Morton engaged the services of the attorney who drafted the settlement for Mrs. Wahlborg, we find the trial court properly construed its ambiguities against Mrs. Wahlborg. See Brignac v. Brignac, 96-1702 at pp. 7-8, 698 So.2d at 957.
Additionally, the correspondence in evidence reveals the parties' attorneys had discussed both the DSM Copolymer annuity and the Grant Chemical retirement plan before the partition was signed. The trial court apparently did not believe Mrs. Wahlborg's contention that although her attorney knew of these retirement benefits, she was not aware of them. Considering all of the evidence, we find the trial court reasonably inferred that Mrs. Wahlborg was aware of and waived all of her interests in the retirement benefits at issue.
Mrs. Wahlborg also alleges the trial court committed legal error in considering various items introduced into evidence during the trial of the exception. First, she challenges the trial court's consideration of the 1983 community property partition, asserting it was never introduced in evidence. She also challenges the court's consideration of Exhibit HW1, an August 26, 1982 letter from Mrs. Wahlborg's counsel at that time to Mr. Wahlborg's counsel. The letter referenced Mr. Wahlborg's retirement benefits and set forth a proposed community property distribution if the retirement benefits were included in the partition. Lastly, Mrs. Wahlborg challenges HW3, an exhibit prepared by Ralph J. Stevens, a certified public accountant who testified on Mr. Wahlborg's behalf. HW3 is a chart that sets forth valuations of the property received by each party as proposed in her attorney's August 26, 1982 letter. Mrs. Wahlborg asserts the court's admission of HW3, is "just a compilation of numbers" that "come from HW1."
We find no merit in Mrs. Wahlborg's contentions that the trial court improperly considered these items of evidence. A review of the record reveals that Mr. Wahlborg's counsel had filed both the partition and HW1 into the record before the trial began. Early in the trial, Mr. Wahlborg's counsel offered and introduced "the entire record in the case," specifically referencing the partition. Mrs. Wahlborg's counsel indicated he had no objection. Later in the trial when Mr. Wahlborg's counsel referenced HW1, the court acknowledged that "it was already in the record." Although Mrs. Wahlborg's counsel argued, at that point, that Mr. Wahlborg had not "testified to any foundation about what's in it or anything else," the objection was made after HW1 had already been introduced into evidence without objection. See La. C.E. art. 103(A)(1); La. C.C.P. art. 1635. Based on these facts, we find no error in the trial court's consideration of the partition and the letter exhibit marked as HW1. Further, Mrs. Wahlborg's objection to the court's consideration of HW3 is that it was based on the division of property addressed in HW1. Because we find no error in the trial court's admission of HW1, we likewise find no error in its admission of HW3.
Mrs. Wahlborg additionally contends the trial court erred in admitting into evidence Mr. Steven's testimony, which addressed the value of the retirement benefits. This contention is based on an incorrect premise that Mr. Steven's testimony was based on documents not introduced into evidence, particularly HW1. Based on our review of the record, we find no support for Mrs. Wahlborg's argument that the valuations used by Mr. Stevens were based on information not contained in evidence. Additionally, we note the decision of whether to admit or exclude expert testimony is left to the great discretion of the trial court, and the decision reached by the trial court will not be disturbed on appeal absent an abuse of that discretion. Likewise, the effect and weight to be given expert testimony is within the broad discretion of the trial court. Fishbein v. State ex rel. LSU Health Sciences Center, 06-0549, p. 8 (La. App. 1st Cir. 3/9/07), 960 So.2d 67, 73, writs denied, 07-0730, 07-0708 (La. 6/22/07), 959 So.2d 495, 505. In this case, the trial court did not abuse its discretion.
Mrs. Wahlborg posits the trial court erred by failing to consider that her "separate property interest in the Goodwood property was somehow transferred to [Mr. Wahlborg]." We conclude it is unnecessary to determine the parties' ownership interests in this property before the partition occurred. The 1983 partition clearly allocated this property to Mr. Wahlborg, and Mrs. Wahlborg's petition does not seek to nullify that partition. Insofar as the property's classification prior to the partition might have affected the valuations of the properties that each party received pursuant to the partition, the record establishes that when Mr. Wahlborg purchased the property, he borrowed a five-percent down payment from his credit union, and he incurred a mortgage note for the balance of the purchase price.[3] The record does not establish that this property had any equity, and, thus, the record does not support Mrs. Wahlborg's argument that she was entitled to an offset based on the allocation of this property to Mr. Wahlborg. Further, the allocation of this property to Mr. Wahlborg in the partition does not necessarily reveal anything regarding the parties' intent with respect to the division of the retirement benefits. Thus, the trial court's classification of this property as Mr. Wahlborg's separate property has no bearing on the issues presented in this appeal.
Mrs. Wahlborg asserts the trial court erred in dismissing her suit without affording her the opportunity to amend her petition. Louisiana Code of Civil Procedure article 934 only requires that the plaintiff be granted an opportunity to amend when such an amendment would cure the objections raised in the exceptions.[4] In other words, to successfully amend a petition, the plaintiff must be able to remove the impediment or objection. Hooks v. Treasurer, 06-0541, p. 12 (La. App. 1st Cir. 05/04/07), 961 So.2d 425, 432. The trial court found that Mrs. Wahlborg had waived her interests in the retirement benefits and was not entitled to a supplemental partition. Based on those findings, allowing Mrs. Wahlborg an opportunity to amend her petition would be futile; an amendment would not cure the objections. See Thinkstream, Inc. v. Rubin, 06-1595, pp. 13-14 (La. App. 1st Cir. 9/26/07), ___ So.2d ___.
For these reasons, we conclude Mr. Wahlborg established the essential facts to sustain his plea of res judicata, and we affirm the trial court's judgment. Appeal costs are assessed against Mrs. Wahlborg.
AFFIRMED.

ATTACHMENT A

NOTICE OF RENDITION OF JUDGMENT AND WRITTEN REASONS
HAROLD JOHN WAHLBORG NO: 59,078 DIVISION "C"
 THE FAMILY COURT
VERSUS
 EAST BATON ROUGE PARISH
ANNE SHERMAN WAHLBORG STATE OF LOUISIANA
TO: MR. JACK M. DAMPF AND MR. BRIAN J. PRENDERGAST
GREETINGS
You are hereby notified that a decision was rendered and spread on the minutes of The Family Court on the 15th day of March 2005, in the above entitled and numbered cause, and the following is a true copy of the entry of said decision.
This matter having been submitted and taken wader advisement, the Court for written reasons assigned rendered judgment as follows:

I. Factual and Procedural Background
The parties were married on August 20, 1958. A Petition for Separation was filed herein on June 10, 1982. The parties were granted a separation on the 24th day of August 1982. Thereafter, a Petition for Divorce was filed in suit number 62,761 "N". The Judgment of Divorce was rendered on July 18, 1983.
Anne Sherman Wahlborg filed a Petition to Partition Community Property on June 11, 2004. Harold John Wahlborg subsequently filed a Peremptory Exception of Res Judicata alleging that on September 23, 1983, the parties entered into a Community Property Partition agreement which was recorded in the Conveyance and Mortgage Records of the Parish of East Baton Rouge. Both parties submitted memorandum indicating that the issue to be resolved at the trial of this matter is whether or not Harold Wahlborg's retirement plans were divided within the Community Property Partition agreement or whether these funds remain an undivided community asset subject to judicial partition.
A trial on all these matters was held on February 3, 2005. After the introduction of evidence, this Court took the matter under advisement.
Harold Wahlborg became employed at DSM Copolymer in 1965, during the marriage of the parties. Harold Wahlborg participated in two retirement plans offered by Copolymer during his ten years of employment with the company. Mr. Wahlborg testified that one of the Copolymer plans was a contributory plan and the other plan was a defined benefits plan. The parties agree that the contributory plan was cashed in during the marriage of the parties. It appears that M k IV Industries Inc may now hold a portion of the remaining DSM Copolymer benefits. When the parties entered into the Community Property Partition in 1983, Mr. Wahlborg was employed with Grant Chemical. It seems that Grant Chemical changed its name to Ferro Chemical at some point.
The outcome of this entire case hinges on whether or not Anne Sherman Wahlborg waived her interest in Harold John Wahlborg's retirement benefits when she signed the Community Property Partition agreement on September 23, 1983 or whether Harold John Wahlborg's retirement benefits with DSM Copolymer and Grant Chemical (Ferro Chemical) are un-partitioned assets of their former community, thus entitling Anne Sherman Wahlborg to a portion of those benefits. This issue has been the subject of much litigation in this state.

II. Law
Each spouse owns a present undivided one-half interest in the community during its existence. La. C.C. art. 2336. To the extent that a property right derives from the spouse's employment during the existence of the marriage, it is a community asset subject to division upon dissolution of the marriage. See La. C.C. art. 2338; Sims v. Sims, 358 So.2d 919 (La. 1978); T.L. James & Co., Inc. v. Montgomery; 332 So.2d 834 (La. 1975). Consequently, when the community is terminated, the employee's spouse is entitled to be recognized as the owner of one half of the value attributable to the pension or deferred compensation right earned during the existence of the community. See La. C.C. art. 2336; Robinson v. Robinson, supra at 1114. When the community is terminated, each spouse becomes a fully vested co-owner in indivision of all property of the former community regime, including pension benefits acquired during the community. See La. C.C. art 2369.2; see also Robinson, 778 So.2d at 1115.
Louisiana jurisprudence is clear that general divestiture language in a community property settlement does not necessarily divest the non-employee spouse of his or her right in the employee spouse's pension. When the agreement does not expressly address the employee spouse's pension, the issue of whether the agreement divests the non-employee spouse of any community property rights m the pension depends on the intent of the parties. Jennings v. Turner, 01-0631 (La. 11/28/01, 803 So.2d 963, 964. The issue of whether a pension was considered m a property settlement is a question of fact. Robinson, 778 So.2d at 1119; Jennings, 803 So.2d at 964.
In Robinson, the Louisiana Supreme Court reviewed the jurisprudence to determine the situations in which courts had allowed supplemental partitions of pension benefits when they were not addressed m community property settlements. When later partitions were allowed, the courts generally had found that the spouses did not discuss the pension benefits before confecting their community property settlements, and therefore, their intent to include those benefits in their agreements was not supported by the evidence. See Hare v. Hodgins, 567 So.2d 670 (La. App. 5th Cir. 1990), reversed in part on other grounds, 586 So.2d 118 (La. 1991); Faucheaux v. Faucheaux, 97-1369 (La. App. 4th Cir 1/28/98), 706 So.2d 654, writ denied, 98-0482 (La. 4/9/98), 717 So.2d 1146.
On the other hand, in cases in which the courts found both spouses were aware of and had discussed the pension benefits prior to confecting their community property settlements, the conclusion reached was that they had intended for the agreement to settle all community property, including pension benefits that were not specifically addressed in the document. See Chrisman v. Chrisman, 487 So.2d 140 (La. App. 4th Cir. 1986); Brignac v. Brignac, 96-1702 (La. App. 3d Cir. 6/18/97), 698 So.2d 953, writ denied, 97-2584 (La. 1/16/98), 706 So.2d 976.
In both the Robinson and Jennings cases, the Louisiana Supreme Court found that the parties had not discussed the husband's pension plan at all during their negotiations leading up to the settlement of community property. In fact, the Court in the Jennings case accepted the wife's testimony that she did not even know her husband had a pension plan until after she had signed the agreement.
In Moon v. Moon, 345 So.2d 168 (La.App. 3 Cir. 1977) the parties executed a community property settlement agreement which failed to include Col. Moon's military retirement pay. Ms. Moon filed suit seeking her share of those benefits. The court found that both parties were aware of Col. Moon's retirement pay, but both thought the retirement pay was Col. Moon's separate property. Neither party discussed the retirement pay with his attorney and the retirement pay was not mentioned during negotiations preceding the settlement. The trial court concluded that the failure to include the retirement pay in the settlement agreement was a "mere omission." The Court of Appeal upheld this decision and stated that by "mutual oversight," the parties simply omitted the pension from the list of community property to be divided or conveyed.
In Day v. Day, 02-0431 (La. App. 1 Cir. 5/28/03), 858 Sold 483, the most recent case on this issue by the First Circuit Court of Appeal, the parties had executed a community property settlement agreement that provided in pertinent part:
Shelby R. Day and Rosie Nell Laborde Day agree that each shall be entitled to and received (sic) 50% each of all 401K savings and stock invested with or issued in either of the (sic) names with Honeywell, Inc. as of October 16, 1991, Shelby R Day agrees to pay all penalties for early withdrawal of any sums of money withdrawn therefrom. Rosie Nell Laborde Day agrees to pay all taxes due on any sums of money received by her therefrom.
* * *
The parties hereto declare that the property described in the foregoing transfers constitutes all of the property belonging to the community formerly existing between them and that they do hereby relieve and release each other from any further accounting for the property herein described.
The agreement did not discuss Mr. Day's military retirement benefits. In a subsequent action, she claimed that the partition agreement was silent as to her community interest in Mr. Day's military retirement benefits and as to any retirement benefits from his employment with Honeywell, and therefore, she sought to have the Court recognize her ownership interest in those retirement plans. Ms. Day's argument was that when a community property partition is silent as to the division of pension benefits, that silence is not a waiver of the spouse's ownership rights, and therefore, the benefits can be later be partitioned. She claimed that the release language in their agreement was restricted to "property herein described" and that this provided further support for her position, since the military retirement benefits were not described anywhere in the agreement.
The Court found that both parties were fully aware of Mr. Day's military retirement benefits and that the parties discussed those benefits extensively during the negotiation process, and that a written proposal from Ms. Day had specifically referenced those benefits. Thus, when the parties entered into the agreement, Ms. Day waived her right to receive a portion of Mr. Day's military retirement benefits.
In Chrisman v. Chrisman, 487 So.2d 140 (La. App. 4th Cir. 1986), Ms. Chrisman sought a supplemental partition of her ex-husband's military retirement benefits, which she contended were community property and had not been included in an earlier voluntary community property partition. Mr. Chrisman contended that his ex-wife had waived her rights to his retirement benefits in the earlier partition agreement. Clause H of that agreement provided as follows:

Alfred B. Chrisman hereby waives any and all other rights that she has or may have against the community existing between Shirley Martin Chrisman and Alfred B. Chrisman.
(Emphasis added.)
The Fourth Circuit Court of Appeal found that this clause, while containing a typographical error, was ambiguous and could be read as a waiver of either party's rights. They further found that the agreement was clearly intended to be a partition of community property, and that clause H of the agreement was intended to make the partition complete and final by providing for a blanket waiver of " any and all other rights ... against the community...." Although the clerical error made it unclear as to which party was waiving his or her rights, the Court found that there was absolutely no doubt that the intent of the parties was that a waiver take place. Since the firm that represented Ms. Chrisman prepared the agreement, the Court construed the ambiguity in the document against her, and concluded that Ms. Chrisman was aware of her right to share in Mr. Chrisman's retirement benefits at the time of the divorce and at the time she negotiated the property settlement, but chose to waive that right when the community was partitioned. Thus, she was not entitled to any of his retirement benefits.
In Brignac v. Brignac, 96-1702 (La. App. 3 Cir. 6/18/97), 698 So.2d 953, Ms. Brignac brought suit to be declared the owner of a part of her former husband's retirement benefits with the Louisiana State Employees Retirement System (LASERS). Mr. Brignac contended that this ownership interest was previously resolved by a community property settlement agreement entered into after he and Ms. Brignac divorced. This community property settlement consisted of two separate documents, neither of which mentioned Mr. Brignac's retirement benefits with LASERS.
The first of the documents was entitled "COMMUNITY PROPERTY SETTLEMENT" and was recorded in the conveyance records. In this agreement, Ms. Brignac received 1.771 acres of land (which included the family home), an automobile, and all movable property in her possession. Mr. Brignac received certain listed movable property, and Ms. Brignac gave him an equalizing promissory note in the amount of $42,000. This agreement further provided "that [the parties] desire to settle and liquidate community property existing between them and that they have agreed to settle same." It further provided that "[t]he parties hereto discharge each other from any further accounting to the community which formerly existed between them the same being fully liquidated as above set forth."
The second of the documents was entitled "COMMUNITY PROPERTY SETTLEMENT AND SIDE AGREEMENT" and was not filed into any public records. This agreement acknowledged the existence of the recorded agreement, explained certain aspects of that agreement, and imposed other obligations on both parties. Of particular importance, this second agreement provided as follows: "It is further agreed and stipulated that by execution of this community property settlement AUDREY DESORMEAUX [Ms. Brignac] will drop all suits before the Courts and will not pursue any further litigation against RAY BRIGNAC resulting from the marriage between them or claim alimony hereafter."
According to the testimony at the trial of Ms. Brignac's suit to recover his retirement benefits, Ms. Brignac admitted that she had always been aware that Mr. Brignac had a retirement plan. Additionally, Ms. Brignac did not argue that she was under the false impression that the retirement benefits were Mr. Brignac's separate property. The Third Circuit Court of Appeal stated that, although it was not explicitly spelled out that Ms. Brignac was waiving any rights that she had to Mr. Brignac's retirement benefits, any ambiguity in the contract was to be construed against her (since her attorney drafted both documents). Accordingly, the Court held that the language in the side agreement constituted a valid compromise and thus, Ms. Brignac waived any right that she may have had to a portion of Mr. Brignac's retirement benefits.

III. Analysis
Like the Brignac, Chrisman, and Day cases, where the wives had always been aware of their spouses' retirement benefits, the testimony at this trial clearly indicated the same thing.
Anne Wahlborg lived with her daughter Elizabeth Wahlborg for a period of two years in Baton Rouge after parties' divorce. She then lived for some time at the Phoenix House, which is similar to a halfway house. After that; she again resided with Elizabeth Wahlborg for two or three years in Colorado. Based on the testimony of Elizabeth and Anne it is clear that Elizabeth cared for her mother both financially and emotionally during this period of time. Elizabeth Wahlborg presented creditable trial testimony that her father's retirement benefits were discussed frequently in the household during the parties' marriage. Her testimony was that the family all knew that Mr. Wahlborg was intent on investing in his retirement accounts so that he could retire to live in the mountains.
Anne Wahlborg testified that she knew that Mr. Wahlborg had a pension at DSM Copolymer at one time, but she stated that she was "not really" aware of the pension at Grant Chemical. Elizabeth Wahlborg testified that the Grant Chemical Pension was the main pension that was discussed since Mr. Wahlborg was employed with Grant Chemical during the divorce proceedings and the property settlement negotiations. Anne Wahlborg testified that she never discussed the pension plans with her daughter. However, Elizabeth Wahlborg testified that Anne Wahlborg told her that she had bargained away the pension for the other property; the premise was that she would receive virtually all of the assets that they had at the time and Mr. Wahlborg would receive his pensions. Elizabeth also stated that she and her mother discussed the DSM Copolymer by name when Anne questioned her about whether Mr. Wahlborg had opened an account in her name on this retirement plan.
Harold Wahlborg testified that he had discussed his retirement benefits with Anne Wahlborg during the marriage. During the settlement negotiations, he stated that his focus was on retaining all of the retirement benefits and was willing to give up more valuable property for sole ownership of his pensions. It was Harold Wahlborg's testimony that he would have never signed the Community Property Partition agreement if he had not been sure he would receive all of his retirement benefits.
During the settlement negotiations Attorney Gray Sexton represented Anne Wahlborg. At one point, during the trial, Anne Wahlborg stated that she had never held a discussion with Gray Sexton regarding the community property settlement. She stated that she had no idea where he got the information regarding the community property from. However, at another point in the trial, she stated that she had met with Gray Sexton on three occasions. She even stated that she had meet with Mr. Sexton, Harold Wahlborg, and counsel for Mr. Wahlborg, Glenn Ducote, to discuss the division of cars and other matters.
The correspondence that was submitted into evidence shows that Gray Sexton and Glenn Ducote negotiated on behalf of their clients toward a settlement. The letter dated August 26, 1982 from Mr. Sexton to Mr. Ducote clearly shows that the retirement benefits were included in the negotiations. The letter from Mr. Ducote to Mr. Sexton specifically names both the Copolymer annuity and the Grant Chemical retirement plan. Therefore, it is the finding of this court that the parties were both aware that both of the pension plans existed and were assets to be considered in the community property partition.
At some point, Anne Wahlborg gave Mr. Morton power of attorney over her affairs and he began handling the negotiations of the settlement. Mr. Morton was the director of the Phoenix House where Anne Wahlborg lived for some time. It is clear from the testimony that Mr. Morton conducted the final negotiations of the partition on behalf of Ms. Wahlborg. It is also clear that Mr. Morton had power of attorney for Ms. Wahlborg thus having the power to act on her behalf. Harold Wahlborg testified that he was contacted directly by Mr. Morton who requested all of the documentation and correspondence regarding the settlement be sent to him. Mr. Wahlborg testified that he discussed both pension plans with Mr. Morton and let Mr. Morton handle the calculations.
Anne Wahlborg testified that she does not know who drafted the Community Property Partition agreement and does not know who paid to have it drafted. However, despite this testimony and based on the testimony of Harold Wahlborg, it is the finding of this court that Mr. Morton, Anne Wahlborg's agent, retained the attorney who drafted the agreement. Therefore, any ambiguity contained in the agreement must be construed against Anne Wahlborg.
In this case, the community property settlement entered into between Harold Wahlborg and Anne Wahlborg provided in pertinent part as follows:
The parties hereto have entered into and by these presents do enter into this community property partition agreement, and by these presents do provide for the division of the community property formerly belonging to the community of acquets and gains; and for the settlement of any and all claims that each has or might have against the separate estate of the other.
Harold John Wahlborg receives all rights, title and interest in and to the following described property:
I. That certain lot or portion of ground, together with all the buildings and improvements thereon, and all the rights, ways, privileges, servitudes, appurtenances and advantages thereunto belonging or in anywise appertaining situated in the City of Baton Rouge, Louisiana, in that subdivision thereof known as GOODWOOD ESTATES, SECTION Z and being described according to the official map thereof on file and of record in the office of the Clerk and Recorder for the Parish of East Baton Rouge, Louisiana, as LOT TWO (2), BLOCK (or square) NINE (9), said subdivision, said lot measuring one hundred (100) feet front on Keed Avenue by a depth between equal and parallel lines of two hundred (200) feet.
2. One certain lot or parcel of ground, together with all the buildings and improvements thereon, situated in that subdivision of the Parish of East Baton Rouge known as MONTERREY PARK SUBDIVISION, being designated on the official map thereof on file and of record in the office of the Clerk and Recorder for the Parish of East Baton Rouge as LOT TWENTY SIX (26) said subdivision, said lot measuring Sixty (60) feet front on Tracy Avenue by a depth on its easterly sideline or Edgebrook Drive of One hundred Twenty-One and 16/100 (121.16) feet a depth on its westerly sideline of One Hundred Twenty-One and 16/100 (121.16) feet and measuring Sixty (60) feet across the rear; being subject to a five (5) foot servitude across the front, a Five (5) foot servitude along its easterly sideline or Edgebrook Drive, a five (5) foot servitude across the rear, and a Seven and 5/10 (7.5) foot servitude across the rear, adjacent to the Five (5) foot servitude.
3. Those items of furniture previously selected by him and now in his possession.
4. The automobile which is his personal automobile and which is in his possession.
5. The sum of $1,000.00 cash.
6. All personal belongings in his possession.
Anne Burr Sherman Wahlborg receives all right, title, and interest in and to the following:
1. One certain lot or parcel of ground together with all buildings and improvements thereon, situated in that subdivision of the Parish of East Baton Rouge, State of Louisiana, known as LA BELLE AIRE, FIRST FILING, and designated on the official map thereof on file in the office of the Clerk and Recorder of this Parish as LOT NUMBER ONE HUNDRED SEVENTY-EIGHT (178), said lot measuring Sixty (60) feet front on La Margie Avenue by a depth between parallel lines of One Hundred Fifty (150) feet; subject to a servitude across the rear Seven and 5/10 (7.5) feet thereof; being the same property acquired by vendor by act of record in Book 2173, Folio 366 of the Conveyance Records of this Parish.
2. One (1) certain lot or parcel of ground, together with all the buildings and improvements thereon, situated in that subdivision in the Parish of East Baton Rouge, State of Louisiana, know as Jefferson Place, and being designated on the official map thereof on file and of record in the Office of the Clerk and Recorder for the Parish of East Baton Rouge, Louisiana, as Lot One Hundred Eighty-Six (186), said subdivision, said lot measuring One Hundred (100') feet front on Richards Drive, by a depth of Two Hundred (200') feet between parallel lines; being subject to a Ten (10') foot servitude across the rear and a Five (5') foot servitude across the East side line.
All silverware and related items.
4. All items of furniture not previously selected by Harold John Wahlborg.
5. The automobile in her possession which is her personal automobile.
6. All checking accounts, savings accounts, certificates of deposit, and other incorporeal movables in her possession or titled in her name.
7. All personal belongings in her possession.
IT IS FURTHER AGREED between the parties hereto:
A. Harold John Wahlborg assumes and binds and obligates himself to pay and shall be solely responsible for the balance due on any and all mortgages, liens and encumbrances against the properties received by him in this agreement, and further assumes and binds and obligates himself to pay that certain unsecured obligation in favor of the Small Business Administration of the United States of America in the principal sum of $5,000.00.
B. Anne Burr Sherman Wahlborg assumes and binds and obligates herself to pay and shall be solely responsible for the balance due on any and all mortgages, liens and encumbrances against the properties received by her in this agreement.
C. The parties hereto shall each hold the other harmless from the payment of any and all obligations herein assumed by them.
Harold Wahlborg testified at trial that the property in Goodwood Estates was acquired after the termination of the community regime and is his separate property. Anne Wahlborg did not contest this testimony. Mr. Wahlborg stated that the Goodwood property was included in the Community Property Partition agreement because the bank required such language to be included. Accordingly, this court finds that the Goodwood property is the separate property of Mr. Wahlborg and as such should not be considered herein.
Other evidence introduced at trial further supports Harold Wahlborg's testimony that the community property settlement was intended to be a final and complete settlement. According to his testimony, Harold Wahlborg received a lesser amount of the assets in the property settlement, and therefore, the only reason he entered into that agreement was because he was going to receive all of his retirement benefits. On the other hand, Anne Wahlborg received most of the substantial assets of their former community, including the triplex in La Belle Aire and the house on Richards Drive.
Harold Wahlborg testified that he knew that the pensions were not specifically included in the Community Property Partition agreement when he signed the documents. He spoke to his lawyer about these concerns. His testimony was that his attorney assured him that the general language of the agreement protected his pension plans.
Ralph Stevens was accepted as an expert certified public accountant by the court based on his qualifications over the objection of opposing counsel. Mr. Stevens presented an analysis of the amounts each party received based on the Community Property Partition agreement and the letter from Grey Sexton to Glen Ducote which valued the items of community property. It is important to note once again that Grey Sexton was Anne Wahlborg's attorney in this matter. In his analysis, Mr. Stevens found that Anne Wahlborg had received $214,000.00 in assets from the house on Richards Drive and the La Belle Aire Tri-Plex. From this amount was deducted the community debts assumed by Ms. Wahlborg in the amount of $141,377.00. Therefore, Anne Wahlborg received $72,623.00 in community property. Harold Wahlborg received $26,600.00 based on the value of the Monterrey Park Duplex and the $1,000.00 cash minus the SBA loan. Based on this calculation, Anne Wahlborg would have received $46,023.00 more than Mr. Wahlborg. Mr. Stevens provided a capitalization of both of the retirement plans to determine the community value of each pension immediately prior to the Community Property Partition agreement. The calculations show that the value of the community portion of the two pensions was $42,747.00. Therefore, when the pension plans are added to Harold Wahlborg side of the calculation equation, Anne Wahlborg received only $3,276.00 more than Harold Wahlborg of the community property.

IV. Conclusion
This Court finds that both spouses were aware of and had discussed the pension benefits prior to confecting their Community Property Partition agreement. Furthermore, this Court finds that the parties discussed those benefits during the negotiation process, and that the written proposal from Gray Sexton specifically referenced those benefits. Therefore, this Court finds that the intent of the parties when they entered into the partition agreement was that Harold Wahlborg was to receive all of his retirement benefits, or in other words, that Anne Wahlborg was waiving her interest in those retirement benefits, in exchange for her receipt of most of the substantial assets of their former community. Accordingly, the relief requested by her is hereby denied.
Thus done, signed and mailed at Baton Rouge, Louisiana on this 15th day of March 2005.
NOTES
[1] Mr. Morton was the director of the Phoenix House, where Mrs. Wahlborg lived for some period of time after her separation from Mr. Wahlborg; and although he was not an attorney, Mrs. Wahlborg entrusted Mr. Morton with the handling of her financial affairs.
[2] A written authority is not required to establish an express authority. See Fernandez v. Hebert, 06-1558, p. 15 (La. App. 1st Cir. 5/4/07), 961 So.2d 404, 411; writ denied, 07-1123 (La. 9/21/07), 964 So.2d 333.
[3] Mr. Wahlborg assumed the liability of this mortgage under the terms of the partition agreement.
[4] Louisiana Code of Civil Procedure article 934 provides:

When the grounds of the objection pleaded by the peremptory exception may be removed by amendment of the petition, the judgment sustaining the exception shall order such amendment within the delay allowed by the court. If the grounds of the objection raised through the exception cannot be so removed, or if the plaintiff fails to comply with the order to amend, the action, claim, demand, issue, or theory shall be dismissed.